IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | :    **Crim No.: 1:12-CR-0301** |
| | : |
| **v.** | : |
| | : |
| | :    **Judge Sylvia H. Rambo** |
| **ALMUNTASSER HBAIU;** | : |
| **GIL CONRAD DIZON;** | : |
| **AHED HBAIU; and** | : |
| **CHRISTOPHER MOUZON** | : |

## M E M O R A N D U M

In this criminal case, four defendants have been charged in this District with multiple offenses arising out of their alleged conspiracy involving the receipt and delivery of misbranded drugs and the structuring of financial transactions. Presently before the court are various motions filed by two of the Defendants, including two motions to transfer venue from the Middle District of Pennsylvania to the Central District of California, pursuant to Federal Rule of Civil Procedure 21(b). (Docs. 37 & 101.) For the following reasons, Defendants' motion to transfer will be granted in part, to the extent the court will sever Count IX and transfer the balance of the indictment to the Central District of California.


## I.     <u>Background</u>

Two of the four defendants, Defendant Almuntasser Hbaiu ("Defendant Hbaiu") and Defendant Christopher Mouzon (Defendant Mouzon), have each filed two motions currently pending before the court, *to wit*: (1) a motion to transfer the proceedings from the Middle District of Pennsylvania to the Central District of California (Docs. 37 & 101); and (2) a motion to sever defendants and counts (Docs.

82 & 103).  Because the court will grant the motions to transfer the proceedings, it will not address the motions to sever.

## A.     Charges

Defendant Hbaiu was indicted in the Middle District of Pennsylvania for conspiring to deliver and receive misbranded drugs in interstate commerce and structure financial transactions with a domestic financial institution, in violation of 18 U.S.C. § 371 (Count I); introducing and delivering misbranded drugs into interstate commerce, in violation of 21 U.S.C. § 331(a) (Count II); receiving misbranded drugs in interstate commerce, in violation of 21 U.S.C. § 331(c) (Count III); engaging in two counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts IV & V); structuring financial transactions with a domestic financial institution, in violation of 31 U.S.C. § 5324 (Count VI); and engaging in bank fraud, in violation of 18 U.S.C. § 1344 (Count VII).  (*See* Doc. 50.)  Defendant Mouzon was charged in the Middle District of Pennsylvania with offenses related to his alleged participation in the conspiracy (Count I) and involvement with the structuring financial transactions (Count VI), and perjury, in violation of 18 U.S.C. § 1621 (Count IX). (*See* Doc. 50.)[1]

## B.     Allegations

As the basis for the indictment, the government alleges the following. Beginning in approximately October 2006, and continuing through March 8, 2013, the date on which the second superseding indictment was filed, Defendant Hbaiu conspired with, *inter alia*, several indicted co-conspirators to introduce and deliver for introduction into interstate commerce, and receive the same, a misbranded drug

---

[1]  The second superseding indictment also contained a forfeiture allegation against all Defendants.

or food, and to evade reporting requirements by structuring transactions with a domestic financial institution. (Doc. 50, ¶ 19.) These actions took place within the Middle District of Pennsylvania and elsewhere, including the states of California, Georgia, and Florida. (*See id.*) Defendant Hbaiu's actions related to the marketing and distribution of several products that were intentionally misbranded as "all natural male enhancement products and dietary supplements," when, in fact, the products contained sildenafil[2] or tadalafil,[3] which are the active ingredients in the prescription drugs Viagra and Cialis and are subject to regulation by the Food and Drug Administration ("FDA"). (*See id.* at ¶ 20.) These products were marketed for distribution on multiple internet web sites,[4] each being owned by a corporation of which Defendant Hbaiu was an officer[5] (*see id.* at ¶¶ 13-15), and were sold through a commercial retailer located within the Middle District of Pennsylvania, which was a business owned by Caliber Investments, Inc., a Pennsylvania corporation of which

---

[2]  Sildenafil Citrate was the established name for the active ingredient in the prescription drug "Viagra" that was indicated to treat erectile dysfunction and was manufactured by Pfizer, Inc. Pfizer was the only company that had an approved New Drug Application on file with the FDA for sildenafil citrate and thus was the only company that could legally market this drug. (Doc. 50, ¶ 5.)

[3]  Tadalafil was the established name for the active ingredient in the prescription drug "Cialis" that was indicated to treat erectile dysfunction and was manufactured by Eli Lilly. Eli Lilly was the only manufacturer that had an approved New Drug Application on file with the FDA for tadalafil and thus was the only company that could legally market this drug. (Doc. 50, ¶ 6.)

[4]  The internet web sites that offered for sale and/or provided information about the mislabeled products were as follows: Liligrow.com, Mojonights.com, Trymojonights.com, Bluediamondpill.com, and pplusmarketing.zendesk.com. (Doc. 50, ¶ 13.)

[5]  The indictment indicates that the websites were registered to six different companies, namely: Performance Plus Marketing, Inc.; H & K Nutraceuticals; True2Beauty, Inc.; Libigrow, Inc.; Xhale Distributors; and PHD Marketing. However, Defendant is alleged to be the officer of only three of those entities, namely: Performance Plus Marketing, Inc.; Libigrow, Inc.; and True2Beauty, Inc. According to the second superseding indictment, the remaining three entities were all "domiciled at the same location as Performance Plus Marketing and rent for those facilities was paid for from an account on which [Defendant] has signatory authority." (Doc. 50, ¶¶ 14, 15.)

Defendant Habiu and another indicted co-conspirator were co-presidents (*Id*. at ¶ 17).

With respect to the misbranded drugs conspiracy, the second superseding indictment alleges that law enforcement agents made several purchases of the products at issue; some purchases were made via orders placed on the internet, while others were made from a brick-and-mortar retail store located within the Middle District of Pennsylvania. (*See generally* Doc. 50, ¶ 22.) Specifically, on March 7, 2012, and July 17, 2012, an FDA agent purchased Libigrow from a retail location within the Middle District of Pennsylvania. (*Id.* at ¶ 22(a).) These purchased products were found to contain an analog of sildenafil. (*Id*.) On March 20, 2012, and July 26, 2012, an FDA agent placed orders from the Middle District of Pennsylvania for Libigrow by way of one of the aforementioned internet websites. (*Id.* at ¶ 22(b); *see also supra* note 4.) The ordered products were shipped to an address within the Middle District of Pennsylvania and were subsequently determined to contain sildenafil, tadalafil, and analogs of sildenafil. (*Id*.) On July 17, 2012, an FDA agent made an undercover purchase of another product, Mojo Nights, at a retail location within the Middle District of Pennsylvania. (*Id*. at ¶ 22(c).) The purchased product was found to contain analogs of sildenafil. (*Id.*) On July 26, 2012, an FDA agent placed an order for the same product by way of an internet website. (*Id*. at ¶ 18(d).) This product was subsequently determined to contain sildenafil, tadalafil, and analogs of sildenafil. (*Id.*) Also on July 26, 2012, an FDA agent made another undercover purchase of a third product, Blue Diamond, from a retail location within the Middle District of Pennsylvania. (*Id*. at ¶ 22(e).) The product was similarly determined to contain sildenafil, tadalafil, and analogs of sildenafil. (*Id.*)

The proceeds from the sales of these misbranded products were deposited into the accounts either belonging to a named Defendant or otherwise connected thereto. (*Id.* at ¶ 21.) The deposits were structured in a way to "avoid cash transaction reporting requirements." (*Id.*)

With respect to the structuring charges, the second superseding indictment alleges that Defendant Hbaiu was involved in structuring numerous transactions at various financial institutions located in California, Georgia, and the Middle District of Pennsylvania, for the purpose of evading reporting requirements. Specifically, on August 26, 2009, three cash deposits were made, each in the amount of $9,800.00. (Doc. 50, ¶ 22(f).) The third $9,800.00 cash deposit was made into a Bank of America bank account of an indicted co-conspirator, Defendant Mouzon, located in Stone Mountain, Georgia. (*Id.*) Defendant Hbaiu's driver's license number appeared on the deposit slip for this transaction. (*Id.*) On February 19, 2010, Defendant Hbaiu, accompanied by another indicted co-conspirator, Defendant Ahed Hbaiu ("Defendant Ahed"), opened a bank account for Caliber Investments at a Fulton Bank branch located within the Middle District of Pennsylvania, at which time Defendant Hbaiu displayed approximately $20,000.00 cash and exchanged approximately $9,000.00 in $50.00 bills for $100.00 bills. (*Id.* at ¶ 22(g).) On October 8, 2010, an indicted co-conspirator, Defendant Gil Dizon ("Defendant Dizon"), conducted the following six transactions, in less than five hours, at various Bank of America branches in the Atlanta, Georgia, area: (1) a $9,900.00 deposit in Caliber Investments's bank account at the Midtown Center branch at 11:32 a.m.; (2) a $9,900.00 deposit in Defendant Ahed's bank account at the Bank of America Plaza branch at 11:56 a.m.; (3) a $9,900.00 deposit into the bank account of Alaa Jacquez, a sister of Defendants Hbaiu and Ahed, at the Ansley Mall branch at 1:18 p.m.; (4) a

$9,900.00 deposit into the account of Bushra Melton, a second sister of Defendants Hbaiu and Ahed, at the Buckhead Crossing branch at 1:26 p.m.; (5) a $9,900.00 deposit into his own account, at the Monarch Plaza branch at 2:03 p.m.; and (6) a $9,100 purchase of a cashier's check payable to Caliber Investments, at the Midtown Center branch, at 4:01 p.m., which was then deposited minutes later into Caliber Investment's bank account at the Midtown Center branch. (*Id.* at ¶ 22(j).) On October 15, 2010, Defendant Hbaiu deposited $9,900.00 into Defendant Ahed's bank account. (*Id*. at ¶ 22(h).) On October 18, 2010, Defendant Hbaiu made a $9,900.00 deposit into Caliber Investments's bank account in Los Angeles, California, and, three minutes later, made a second $9,900.00 cash deposit into Defendant Ahed's bank account through a different teller at the same branch. (*Id.* at ¶ 22(h).) On November 1, 2010, Defendant Hbaiu made another $9,000.00 cash deposit into Caliber Investments's bank account, again in Los Angeles, California. (*Id*. at ¶ 22(i).) Approximately eight minutes later, while at the same branch, Defendant Hbaiu made a second $9,000.00[6] deposit into Defendant Ahed's bank account. (*Id.*)

Tying the misbranded drug conspiracy to the structuring financial transactions and real property located in the Middle District of Pennsylvania, the second superseding indictment alleges that, between May 2009 and September 2009, "a substantial portion of the structured cash deposits was used to satisfy a bank mortgage held on the residence of Bushra and James Melton" located within the Middle District of Pennsylvania, which was titled, approximately one year later, to Defendant Hbaiu by way of a quit claim deed. (*Id.* at ¶¶ 22(k) & (l).) The second

---

[6] The $9,000.00 total deposit was comprised of $7,000.00 in cash and $2,000.00 in personal money orders. (*Id.* at ¶ 22(i).)

superseding indictment further alleges that, between August 2009 and March 2011, a substantial portion of the structured cash deposits were used to fund the business operations of Caliber Investments, 1 Stop Sunoco Gas Station and Convenience Store, and Eclipse Buildings, Inc., all located within the Middle District of Pennsylvania. (*Id*. at ¶ 22(m).)

With respect to the bank fraud charge, the indictment alleges that Defendants Hbaiu and Ahed executed a scheme to defraud financial institutions insured by the Federal Deposit Insurance Corporation and obtained two credit cards under false pretenses, the first in the name of Defendant Hbaiu's mother, who subsequently filed for bankruptcy in January 2011, and the second in the name of an individual serving a sentence of life imprisonment in Florida, which permitted Defendant Ahed to "operate anonymously." (*See* Doc. 50, Count VII.)

With respect to the perjury charge (*see* Doc. 50, Count IX), the second superseding indictment alleges that Defendant Mouzon willfully and knowingly made false statements while under oath before a federal Grand Jury in the Middle District of Pennsylvania in connection with the investigation of the aforesaid structuring transactions.

### C.  Procedural History

On November 28, 2012, a Grand Jury sitting in the Middle District of Pennsylvania returned an indictment charging Defendant Hbaiu with five counts. (Doc. 1.)  Defendant Hbaiu was arrested in the Central District of California, and was released to the supervision of a pre-trial services officer in that district.  On December 20, 2012, Defendant Hbaiu made his initial appearance in the Middle District of Pennsylvania, and entered a plea of not guilty. (*See* Doc. 17.)  On January 23, 2013, the Grand Jury returned a superseding indictment, which added a forfeiture

allegation against Defendant Hbaiu. (Doc. 29.) On February 1, 2013, Defendant Hbaiu filed a motion to transfer the proceedings from the Middle District of Pennsylvania to the Central District of California (Doc. 37), which was opposed by the Government (Doc. 42). In its response in opposition, the Government stated that it would be presenting additional evidence to the Grand Jury, and on March 8, 2013, the Grand Jury returned a second superseding indictment, which added, *inter alia*, three defendants, one of whom was Defendant Mouzon. (Doc. 50.) On March 19, 2013, Defendant Mouzon made his initial appearance in this district, and entered a plea of not guilty. (Doc. 67.) On June 14, 2013, Defendant Mouzon filed a motion to transfer the proceedings from the Middle District of Pennsylvania to the Central District of California. (Doc. 101.) The Government similarly opposes Defendant Mouzon's motion. (Doc. 106.)

On July 24, 2013, a hearing was held on the pending motions. The purpose of the hearing was set forth by the court in its scheduling order as follows:

> Because a review of the pending motions indicates that the court will be required to make factual findings, and that the disposition of the m otions may be interrelated, IT IS HEREBY ORDERED that a hearing in the captioned matter is scheduled . . . . At the hearing, counsel will be expected to present evidence and argument on the three aforementioned pending motions.

(Doc. 90; *see also* Docs. 99 & 105.) Although neither Defendant Hbaiu, Defendant Mouzon, nor the Government presented testimonial evidence at the hearing, counsel made representations and presented argument on the matters, which was largely consistent with the arguments set forth in their briefing. At the close of the hearing, the court issued an order directing both Defendants and the Government to submit a list of their witnesses for an *in camera* review, including the witnesses' locations, the

proposed testimony of each witness, and the witnesses' ability to testify. (Doc. 118.) The lists have been submitted by the parties and reviewed by the court.

**II**.        **Discussion**

As stated, both Defendants have filed motions seeking to transfer the case to the Central District of California, pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure. (*See* Docs. 37 & 101.) The thrust of Defendants' argument is that Rule 21(b) and the standards addressed by the Supreme Court in *Platt v. Minn. Min. & Mfg. Co.*, 376 U.S. 240 (1964), favor transferring this case.

**A.        Legal Standard**

Upon motion by defendant, a "court may transfer the proceeding, or one or more counts, against the defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." Fed. R. Crim. P. 21(b). Motions under Rule 21(b) are addressed to the court's discretion. *United States v. Coffee*, 113 F. Supp. 2d 751, 753 (E.D. Pa. 2000). The burden rests with the defendant to show that transfer would serve the purpose of the rule, but the defendant need not show "truly compelling circumstances." *In re United States*, 273 F.3d 380, 388 (3d Cir. 2001).

The Supreme Court has endorsed ten factors courts should consider in deciding a Rule 21(b) motion: (1) the location of the defendant; (2) the location of potential witnesses; (3) the location of events likely to be in issue; (4) the location of documents and records likely to be involved; (5) the potential disruption of the defendant's business unless the case is transferred; (6) the expense to the parties; (7) the location of counsel; (8) the relative accessibility of place of trial; (9) the docket condition of each district or division; and (10) any other special elements. *See Platt*,

376 U.S. at 243-44.[7]  Moreover, it is important not to overlook the Supreme Court's statement in *Platt* that a defendant is not entitled to defend his case in his or her home district.  *See Platt*, 376 U.S. at 245-46.  As the Third Circuit recognized in *In re United States*, this statement "has been frequently relied on as one of the bases for denying transfer in criminal cases."  273 F.3d at 388-89 (citing *United States v. Bittner*, 728 F.2d 1038, 1041 (8th Cir. 1984); *United States v. Kopituk*, 690 F.2d 1289, 1322 (11th Cir. 1982); *United States v. Espinoza*, 641 F.2d 153, 162 (4th Cir. 1981)).

The defendant must support a motion to transfer with "affidavits, depositions, stipulations, or other documents tending to establish the necessary elements for a transfer."  *In re United States*, 273 F.3d at 386 (citing *Plum Tree, Inc. v. Stockment*, 488 F.2d 754, 756-57 (3d. Cir. 1973)).  Such evidence may include:

> [N]ames and addresses of witnesses whom the moving party plans to call, . . . affidavits showing the materiality of the matter to which these witnesses will testify, statements by the moving  party of the business difficulties or personal hardships that might result from . . . having to defend against the suit in the district court where it was originally brought, affidavits concerning the relative ease of access to sources of documentary  evidence, and other m        aterials  where appropriate.

---

[7]  Although this test was not expressly formulated to deal with natural person defendants in a criminal case, and *Platt*, a criminal antitrust case involving a corporate defendant, did not discuss or analyze the elements at any length, courts faced with motions under Fed. R. Crim. P. 21(b) typically apply the *Platt* ten-part test.  *See, e.g., In re United States*, 273 F.3d at 387-88 (articulating the *Platt* factors as relevant for purposes of an individual natural person defendant's motion to transfer); *United States v. Chitolie*, Crim. No. 09-cr-0026, 2010 WL 2384550, *4 (D.V.I. June 8, 2010) ("The *Platt* factors . . . are generally used to determine the appropriateness of an interdistrict transfer under Rule 21."); *United States v. Negron*, Crim. No. 08-cr-0501, 2008 WL 5272056, *2 (D.N.J. Dec. 16, 2008) (applying the *Platt* factors to the individual natural defendant's motion to transfer proceedings under Rule 21).

*United States v. Streeval*, Crim. No. 00-cr-0477, 2001 WL 34355637, *1 (E.D. Pa. Dec. 3, 2001).

No one of the *Platt* factors is dispositive, and a balance should be struck in determining which are of the greatest important in the case before the court. As the Third Circuit articulated in *Coffee*:

> "It is unlikely that any of [the *Platt* factors] will be present by itself in a particular case. Ordinarily the various factors appear in com bination, with som e pointing in favor of transfer and others against tran sfer. It is incumben t on the court in such a case to strike a balance and decide which factors seem to be of greatest importance in that case."

113 F. Supp. 2d at 753-54 (quoting 2 Fed. Prac. & Proc. § 344 (2d ed. 1982 & Supp. 2000). With this framework in mind, the court will address the foregoing factors.

## B.    Analysis

Based on the allegations contained in the indictment, declarations submitted with regard to the instant motions, and representations made by counsel in their briefs and at the July 24, 2013 hearing, the court finds that the locations of the Defendants, possible witnesses, and events likely to be at issue weigh heavily in favor of transfer.

As to be expected, some of the *Platt* factors are neutral. For example, the accessibility of a place of trial are relatively neutral, as both Harrisburg and Los Angeles are cities with nearby airports. The location of documents and records is also neutral, as the Government represents that "all documents and records were seized from . . . [D]efendant [Hbaiu]'s warehouse in Commerce, California," but that the documents have since "been scanned onto CDs and provided in discovery."

(Doc. 42, p. 12 of 16.)  Thus, the documents are easily transportable.[8]  Finally, the docket condition factor is also relatively neutral, as the time from filing to disposition for felony criminal cases in the Middle District of Pennsylvania and the Central District of California is within three months from each other, and the amount of overall filings and criminal felony filings per judge are similar.  *See* United States District Courts – National Judicial Caseload Profile, available at http://www. uscourts.gov/viewer.aspx?doc=/uscourts/Statistics/FederalCourtManagementStatistic s/2013/district-fcms-profiles-march-2013.pdf.  (Last accessed Aug. 25, 2013).

   As an initial matter, the Government asserts that there is a "general presumption" that a criminal prosecution should be retained in the original jurisdiction.  (*See* Doc. 42, pp. 3-4 of 16.)  A too stringent adherence to this "presumption," however, is at odds with Rule 21(b), which addresses the convenience of trial.  Accordingly, the court must examine each of the remaining *Platt* factors and determine whether Defendants have carried their burden in demonstrating that transfer of the matter to the Central District of California is appropriate.

## 1. <u>Locations of the Defendants</u>

   With regard to the locations of the Defendants, the Government argues that although both Defendants are indisputably located in California, their location is not dispositive, and both Defendants have significant ties to the Middle District of Pennsylvania.  The Government further asserts that Defendant Hbaiu has numerous family members whom he often visits in the Middle District of Pennsylvania. Moreover, the Government represents that Defendant Hbaiu signed the lease for the

---

[8]  Furthermore, the Government represents that these documents are now physically located in Maryland–not Pennsylvania.  (Doc. 42, p. 12 of 16.)

California property where he claims to reside on October 20, 2012, and frequently travels throughout the United States while marketing his products.

Although a defendant does not have the right to be tried in his or her home district, *see In re United States*, 273 F.3d at 388 (citing *Platt*, 376 U.S. at 245-46), a defendant's residence deserves consideration under the *Platt* analysis. Here, although both Defendants continue to have certain ties to the Middle District of Pennsylvania, they both presently reside in California. Furthermore, having family members who reside in this district does not necessarily make it convenient for Defendants to travel across the country to defend a criminal action. As the focus of this inquiry is the impact of Defendants' location on the convenience of litigation, this factor weighs in favor of transferring the matter.

## 2.   Possible Witnesses

Defendants contend that a significant number of possible defense witnesses live in California. As stated, in order to assess this factor, the court requested counsel for each party to submit a list of potential witnesses, including their location and proposed testimony. Of the Government's proposed witnesses, nine are located in California or surrounding states, nineteen are located in Pennsylvania or surrounding states, and eight are located elsewhere. Of Defendant Hbaiu's proposed witnesses, thirteen are located in California, none are located in Pennsylvania, one is located in Atlanta, Georgia, and one is located in Washington, D.C. All eleven of Defendant Mouzon's proposed witnesses are located in California.[9] Clearly, the overall majority of witnesses who will likely be called to

---

[9]  Although the court notes that several witnesses will provide character evidence and that the court may impose limits on Defendants' presentation of cumulative character evidence, the state of mind of each Defendant will be at issue at trial. While not all of the character witnesses may ultimately

<span style="float:right">(continued...)</span>

testify in this case are located in California. Thus, Defendants have sufficiently demonstrated that there will be an inconvenience to the majority of potential defense witnesses associated with trial in this District.

The court must also consider the potential inconvenience to the Government. Undoubtedly, moving prosecution to the Central District of California would involve some inconvenience to many of the Government's witnesses while being more convenient to the remaining witnesses. However, because the overall majority of witnesses – including nearly all of Defendants' witnesses – are located in California, this factor weighs in favor of transfer.

### 3.    Expenses to the Parties

Related to the court's analysis to the first and second factors, Defendants contend that defending the case in the Middle District of Pennsylvania will present a financial hardship associated with travel and lodging for them and their witnesses. While the Government acknowledges that Defendants will bear travel costs if the case remains in this District, it argues that Defendant Hbaiu "admits to earning an extremely substantial income" and "has sufficient financial resources to retain private counsel and travel all over the world." (Doc. 42, p. 13 of 16.) However, in contradiction to the Government's contention that "there is no evidence to suggest [Defendant Hbaiu] cannot bear these travel expenses" (*Id*.), Defendant Hbaiu's declaration asserts that, in light of the pretrial release conditions and seizure of his personal and business bank accounts, he is "unable to properly fund a defense to [the pending] charges," and that the additional expense of his witnesses' travel to Pennsylvania results in an extreme financial hardship. (*See* Doc. 37, p. 22 of 29.)

---

[9] (...continued)
be allowed to testify at trial, the court assumes, for purposes of disposition of the instant motion, that it will elect to admit all character evidence proposed by the parties.

The appropriate inquiry is not into the extent of the costs, but rather how much the defendant can bear.  *See United States v. Haley*, 504 F. Supp.1124, 1129 n. 32 (E.D. Pa. 1981) (citing *United States v. Culoso*, 461 F. Supp. 128, 136 n. 12 (S.D.N.Y. 1978)).  There is no doubt that a trial in the Middle District of Pennsylvania will greatly increase Defendants' costs.  In response, the Government cites the expense of bringing the prosecutor and witnesses to California.  But given the almost even split of the location of the Government's own witnesses (*see supra* Part II.B.2), it is difficult to evaluate a significant cost differential to the Government.  Moreover, this court will not permit a criminal defendant's fundamental due process rights to take a backseat to the public fisc.  For these reasons, the court finds that this factor weighs in favor of transfer.

### 4. <u>Location of Events Likely to Be At Issue</u>

Defendant argues that the location of events favors transfer because the alleged misbranded products were purchased in California, and that the only allegation of structuring occurring in Pennsylvania was a single exchange of approximately $9,000.00 of United States currency.  The Government responds that law enforcement agents made several undercover purchases of misbranded drugs in the Middle District of Pennsylvania, including purchases made from both Defendant Hbaiu's website and brick and mortar retail locations.

Where a defendant's actions occurred is relevant to this factor.  *Coffee*, 113 F. Supp. 2d at 755-56; *Haley*, 504 F. Supp. at 1128 (granting motion to transfer where many of the defendant's overt acts occurred in the proposed district).  In Defendant Hbaiu's brief, he draws a comparison to the facts in *Coffee*, 113 F. Supp. 2d at 755.  (Doc. 37, p. 10 of 29.)  Defendant Hbaiu's reliance, however, is clearly misplaced.  In *Coffee*, the defendants never "set foot in [the Eastern District of

Pennsylvania], and there was no communication with Pennsylvania other than the telephone calls, faxes[,] and packages sent from Ohio to Pennsylvania." *Coffee*, 113 F. Supp. 2d at 755. In this case, neither the Government nor Defendants argue that Defendants are totally physically removed from this District. Rather, the parties request the court draw opposite conclusions: Defendants ask the court to conclude that the *majority of events* at issue occurred in California, while the Government asks the court to conclude that the *object of the conspiracy* was in the Middle District of Pennsylvania.

Based on the record, including the representations of counsel, the court finds that the "nerve center" of the events at issue was in California. *See United States v. Negron*, Crim. No. 08-cr-0501, 2008 WL 5272056, *4 (D.N.J. Dec. 16, 2008) (citing *Haley*, 504 F. Supp. at 1128). With respect to the misbranding portion of the conspiracy, Defendant Hbaiu operated his business from California, and had a warehouse located within that state. That warehouse was searched in December 2012, and misbranded product was seized therefrom. The products were presumably sent to the law enforcement agents and retailers in the Middle District of Pennsylvania. Moreover, the charges related to the misbranding are largely tied to Defendant Hbaiu's internet business. Defendant Hbaiu's internet business presumably touched all fifty states, and there is no particular reason why this case should be tried in the location that a government agent ordered the products, rather than in the district in which the products entered into the stream of commerce which is where Defendant Hbaiu resides, works, and maintains his business.

With respect to the structuring portion of the conspiracy, the majority of events at issue occurred in Georgia and California. The only structuring transaction alleged in the second superseding indictment related to Defendant Hbaiu and Ahed's

exchanging approximately $9,000.00 in United States currency. In comparison, the second superseding indictment alleges that Defendant Hbaiu participated in two structuring transactions in California (Doc. 50, ¶¶ 22(h) & (i)), and one structuring transaction in Georgia (*Id*. at ¶ 22(f)). The only structuring transaction in which Defendant Mouzon is alleged to have participated took place in Georgia. (*Id*. at ¶ 22(f).)

Although the second superseding indictment alleges that "a substantial portion of the structured cash deposits" was used to satisfy a bank mortgage on a piece of real property located in Pennsylvania which was ultimately transferred to Defendant Hbaiu and further used to fund the business operations of Defendant Hbaiu's businesses located in Pennsylvania (*see id.* at ¶¶ 22(k)-(m)), the focus of the inquiry under this factor is the *location of events*, rather than the *object* of the conspiracy. While laying venue in this district is, to be sure, constitutional and in conformity with the venue statute, the majority of Defendants' actions in connection with the crimes alleged in this indictment took place in California. Accordingly, the court concludes that the location of events at issue tips in favor of transfer.

### 5. <u>Potential Disruption to Defendants' Businesses</u>

Defendant Hbaiu argues that he continues to run a number of businesses from his warehouse in California, and that due to the large number of clientele, he must be prepared to produce large quantities of inventory. Defendant Hbaiu represents that he works upwards of seventy hours per week, and oversees up to fifteen employees and contractors based out of his California warehouse. Defendant Mouzon represents that he is currently employed as a senior manager at a chain restaurant located in California, and that he soon expects to be promoted to general manager. Defendant Mouzon argues that multiple trips across the country would

negatively impact his chances at the promotion and continued employment. In response, the Government argues that trial in this matter will likely not take longer than a week. Moreover, with respect to Defendant Hbaiu, the Government argues that his business requires his frequent travel away from California, which is evidence that he need not be physically present in California for the business' success.

Undoubtedly, trial in any location will interfere with both Defendants' businesses. That said, in terms of convenience to the Defendants, transferring the case to California would clearly pose less disruption to their businesses. Although the court is not convinced that Defendant Hbaiu's business would be as greatly impacted as he represents, being thousands of miles away from his business will unquestionably have an adverse effect on each Defendants' employment. Accordingly, the court concludes that the disruptive impact upon Defendants' businesses by trial in this District also favors transfer.

### 6. <u>Location of Counsel</u>

Defendant Hbaiu has privately retained counsel, and although Defendant Hbaiu's counsel has a principal office in New York, he also has an office and residence in California. Accordingly, Defendant Hbaiu represents that transferring the matter to California would be more economical, as he would not have to pay for his counsel's lodging. Defendant Mouzon, on the other hand, has court-appointed counsel. Where a defendant is represented by appointed counsel, the location of counsel, even if in the current district, does not disfavor transfer because counsel may be substituted. *Haley*, 504 F. Supp. at 1128. ("In the event of transfer [from Pennsylvania to Georgia], the Georgia court may consider appointing local counsel."). Moreover, if new counsel is appointed, presently retained counsel will undoubtedly sufficiently acquaint substitute counsel with the case. Thus, the

location of Defendant Mouzon's current court-appointed counsel does not weigh in favor of retaining the matter in this District.

The convenience of Defendants' counsel, of course, is balanced against the convenience of Government counsel. Transfer of the matter will certainly impose inconvenience on the Government by requiring travel by the individual prosecutor to California for at least a week to prosecute the case. Accordingly, either the Assistant United States Attorney or Defendant Hbaiu's counsel will incur the burden of travel. However, only defense counsel's travel costs will be absorbed by a private individual. Under Rule 21(b), the court must attempt to balance this inconvenience against the potential conveniences of the other forum. In the end, the court concludes that this factor weighs slightly in favor of transfer.

### 7. Special Considerations

Finally, the Government urges the court to consider the significant amount of judicial resources that the Middle District has already invested in this case. (Doc. 42, p. 5 of 16.) This court understands the Government's desire to retain the case in this District. However, judicial economy and expended resources do not convince the court, in this instance, that the matter should stay here in light of the serious prejudice Defendants will face by defending the action in this District compared to defending the action in California. Moreover, the expended resources will not be for naught if the matter is transferred; these Defendants will be prosecuted for their alleged criminal activity regardless of the venue. The convenience of the Government in pursuing the prosecution, however, is subject to Rule 21(b), and must give way to the principles of fairness embedded in that Rule.

Lastly, the Government argues that Defendant Mouzon is charged with perjury due to his allegedly false testimony given before the Grand Jury sitting in the

Middle District of Pennsylvania, which, according to the Government, is "an offense that is inextricably connected" to the misbranding and structuring conspiracy but "for which there is no venue in California." (Doc. 42, p. 5 of 16.) It follows that transferring the matter to California may result in duplicitous litigation, which is at odds with judicial economy.

The United States Constitution guarantees to criminal defendants a trial "in the State where the said Crimes shall have been committed," U.S. Const. art III, § 2, cl. 3, by a "jury of the State and district wherein the crime shall have been committed." U.S. Const. amend VI. This right is implemented by Federal Rule of Criminal Procedure 18, which provides that, "[e]xcept as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed." Moreover, Congress did not include a venue provision in the federal statute governing the perjury charges. *See generally* 18 U.S.C. § 1621. Rule 18, therefore, would seem to dictate that defendant must be prosecuted for the alleged perjury in the Middle District of Pennsylvania, and that the indictment in this case with regard to Count IX would be improperly transferred to the Central District of California.

Under these circumstances, there is case law that provides authority for the proposition that venue with regard to a perjury charge is proper in either the district in which the defendant actually committed the act of perjury or in the district in which the affected proceeding in pending. *See, e.g., United States v. Reed*, 773 F.2d 477, 482 (2d Cir. 1985).[10] However, based on the Government's position that

_____

[10] The Second Circuit based its decision in *Reed* on an in-depth analysis of the intent behind Section 1623, which makes it unlawful to make false declarations before a grand jury or court. The court found that one of the main purposes in designing the perjury statute was the "deterrence [of]
(continued...)

20

the perjury charge in this matter has "no venue in California," the court will sever the perjury charge before transferring the balance of the indictment, and thus retain jurisdiction as to that Count in this District for trial.

Although the court has considerable empathy for the Government's concerns, the fact that Defendant Mouzon's acts underlying the perjury charge at Count IX occurred in this district does not compel the court to decline to transfer the balance of the indictment.

## III.        <u>Conclusion</u>

Of the seven factors at issue, at least five weigh in favor of transferring the matter to the Central District of California.  These five factors include those that the court finds most compelling, namely the location of Defendants and the majority of proposed witnesses, events at issue, and burdensome expenses associated with retaining the matter in this District.  Additionally, the location of counsel weighs slightly in favor of transfer, and the remaining factors are neutral.  Therefore, in the

---

[10](...continued)
perjurious testimony in pending proceedings." *See Reed*, 773 F.2d at 483.  The court came to the conclusion that "[t]his concern over the effect of perjury in proceedings ancillary to pending parent proceedings . . . supports [the] view that venue is proper in either location." *Id*.  In other words, the perjury is "inextricably bound" to the parent proceedings, so that to separate the trial of the perjury charge from that of the related charge would only undermine the very purpose of 18 U.S.C. § 1623. *Id*.
The Second Circuit then adopted and applied to the perjury count what it called the "substantial contacts rule." *Id*. at 481.  This rule "takes into account a number of factors [including] the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding." *Id*.  The court found that these factors, when analyzed in conjunction with the intent of 18 U.S.C. § 1623, "lead[ ] to the conclusion that perjury in one district in a proceeding ancillary to a proceeding in another district may be prosecuted in either." *Id*. at 483.
The court recognizes that the posture of this case is unique, as the ancillary proceeding to the perjury charge was pending in this district at the time the perjurious conduct occurred.  Accordingly, while the court acknowledges an argument in support of prosecuting the perjury charge along with the other charges in the Central District of California, it declines to decide whether the charge could properly be prosecuted outside this District.

exercise of the court's discretion, the court will sever Count IX of the indictment, and will grant Defendants' motion to transfer these proceedings to the United States District Court for the Central District of California with respect to the balance of the indictment.   An appropriate order will issue.

s/Sylvia H. Rambo<br>United States District Judge

Dated:  August 30, 2013.